T.C. Memo. 1997-276

UNITED STATES TAX COURT

TED W. GLEAVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

747 KENMORE AVE., INC., Petitioner <u>v</u>. COMMISSIONER
OF INTERNAL REVENUE, Respondent

Docket Nos. 3586-87, 10512-89.           Filed June 18, 1997.

Individual petitioner (G) owned corporate petitioner
(K).  G caused K to write checks drawn against K's account
(1) to pay for investments and personal expenses of G, or
(2) that were payable to cash or other.  K filed tax returns
for 1980, 1981, and 1982, but G did not.  R used the bank
deposits method and an analysis of checks disbursed in
determining deficiencies against K.

1.  <u>Held</u>: G and K are liable for additions to tax for
civil fraud for 1980, 1981, and 1982.  Secs. 6653(b) and
6653(b)(1), I.R.C. 1954.

2.  <u>Held</u>, <u>further</u>, G and K are liable for additional
additions to tax for 1982 based on the portion of the
deficiencies attributable to fraud; amounts redetermined.
Sec. 6653(b)(2) I.R.C. 1954.

3. _Held_, _further_, amounts of deficiencies redetermined.

Donald L. Summer, for petitioners.

Jerome F. Warner and Matthew I. Root, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, _Judge_:  Respondent determined deficiencies in Federal individual and corporate income tax and additions to tax under section 6653(b)[1] (fraud) against petitioners as follows:

| | | | Additions to tax | | |
|---|---|---|---|---|---|
| Petitioner | Year[1] | Deficiency[2] | Sec. 6653(b) | Sec. 6653(b)(1) | Sec. 6653(b)(2) |
| Ted W. Gleave | 1980 | $50,619.25 | $25,309.63 | --- | --- |
| Dkt. No. 3586-87 | 1981 | 266,339.71 | 133,169.86 | --- | --- |
| | 1982 | 52,610.08 | --- | $26,305.04 | [3] |
| 747 Kenmore | 1980 | 2,972.00 | 1,486.00 | --- | --- |
| Ave. Inc. | 1981 | 317,523.17 | 158,761.59 | --- | --- |
| Dkt. No. 10512-89 | 1982 | 191,446.02 | --- | 95,723.01 | [3] |

[1]  Calendar years for the individual petitioner and fiscal years ending Aug. 31 for the corporate petitioner.

[2]  Of these amounts in docket No. 3586-87, $2,097.90 for 1980, $2,762.10 for 1981, and $3,029.40 for 1982 are self-employment taxes under ch. 2; the remainder are income taxes under ch. 1.

[3]  50 percent of the interest due on the entire deficiency.

---

[1]     The substance of sec. 6653(b) as in effect for 1980 and 1981, and sec. 6653(b)(1) as in effect for 1982 appears in secs. 6651(f) and 6663 of present law.

Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue.

By answer to the petition of Ted W. Gleave, docket No. 3586-87, respondent asserts as to each of the years in issue, in the alternative to section 6653(b), additions to tax under sections 6651 (failure to timely file tax returns), and 6653(a) (negligence, etc.).  See secs. 6214(a), 6653(d).

Petitioner Ted W. Gleave is hereinafter sometimes referred to as Gleave.  Petitioner 747 Kenmore Ave., Inc., is hereinafter sometimes referred to as Kenmore.

The instant cases have been consolidated for trial, briefing, and opinion.

After concessions by both sides,[2] the issues for decision are as follows:

(1) Whether Gleave is liable for civil fraud additions to tax under section 6653(b) (for 1980 and 1981), and under sections 6653(b)(1) and 6653(b)(2) (for 1982) and, as to section 6653(b)(2), in what amount.

(2)  Whether Kenmore is liable for civil fraud additions to tax under section 6653(b) (for its fiscal 1980 and 1981), and under sections 6653(b)(1) and 6653(b)(2) (for

---

[2]     Gleave concedes that he did not file income tax returns for any of the years in issue.  Petitioners concede that certain of the checks that Kenmore issued are for Gleave's personal expenses.  Respondent concedes adjustments that, respondent contends, reduce Gleave's deficiencies to $26,820.24 for 1980, $259,373.31 for 1981, and $50,213.68 for 1982; and reduce Kenmore's deficiencies to $215,601.05 for its fiscal 1981, and $155,587.90 for its fiscal 1982.  Respondent's concessions as to Gleave aggregate almost one-tenth of the amounts determined against Gleave; those as to Kenmore aggregate more than one-quarter of the amounts determined against Kenmore.  The additions to tax are reduced accordingly.

its fiscal 1982) and, as to section 6653 (b)(2), in what amount.

(3) What the amount is of Gleave's and Kenmore's unreported income.

FINDINGS OF FACT[3]

---

[3] Rule 151(e) provides that "All briefs shall contain the following in the order indicated". Petitioners' opening and answering briefs (66 pp. and 16 pp., respectively) essentially ignore the first four of the six subparagraphs of the Rules' instructions. Our ability to understand petitioners' contentions was handicapped by their failure to obey the Rules' instructions. In many instances, our ability to ascertain the basis for those of petitioners' contentions that we do understand, was defeated by petitioners' failure to obey the instruction in Rule 151(e)(3) that--

> In each such numbered statement, [proposed finding of fact] there shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement.

In addition, petitioners have ignored the instruction in Rule 151(e)(3) that--

> In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact.

Under the circumstances, we have assumed that petitioners do not object to respondent's proposed findings of fact except to the extent that petitioners' statements on brief are clearly inconsistent therewith, in which event we have resolved the inconsistencies based on our understanding of the record as a whole. See Estate of Jung v. Commissioner, 101 T.C. 412, 413 n.2 (1993).

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the respective petitions were filed in the instant cases, Gleave resided in Grand Island, New York, and Kenmore had its principal place of business in Kenmore, New York, a village adjacent to Buffalo, New York.

### Background

Gleave attended school through the tenth grade, and he earned a G.E.D., the equivalent of a high school diploma. Gleave began working when he was 14, about 1956. For the next 10 years or so he held several jobs, including military service and construction work. About 1966 Gleave bought a nursery, called Ted's Nursery, which he operated as a proprietorship. Gleave sold Ted's Nursery about 1978; he took back a purchase-money mortgage of about $75,000, which was paid at the rate of $550 per month.

Kenmore is a New York corporation organized about 1972; at all pertinent times Gleave was Kenmore's president and sole owner. When Kenmore was organized, it was a secondary business to Ted's Nursery. During the years in issue Kenmore operated a retail gasoline station, an automobile repair shop, and a dump truck and construction business, and transported and sold-wholesale bulk fuel. Kenmore was not in business when its petition was filed in the instant cases.

Kenmore's principal business location was in Kenmore, at 747 Kenmore Avenue, hereinafter sometimes he referred to as the Kenmore location. The gasoline station business that Kenmore operated at the Kenmore location will hereinafter sometimes be referred to as the Kenmore station.

Gleave did not file Federal income tax returns for any of the years in issue.[4] However, Gleave caused Kenmore to file Federal corporate income tax returns for its fiscal years ending August 31 of 1980, 1981, and 1982. These tax returns were prepared by Kenmore's accountant, Norbert Schechter, C.P.A., hereinafter sometimes referred to as Schechter. Kenmore's 1980 and 1981 tax returns were signed by Gleave.

During the years in issue Gleave did not have a checking account in his own name in any financial institution in the United States, and it appears that Gleave did not keep personal records. During the years in issue Kenmore had a checking account in its name at M & T Bank. This account will hereinafter sometimes be referred to as Kenmore's Account. Gleave used Kenmore's Account for his personal banking. Many (if not all) of Gleave's personal expenses were paid out of Kenmore's Account.

<u>Kenmore</u>

---

[4] For each of the years in issue, Gleave's tax status is married filing separately; he is not entitled to a dependency deduction for his wife; and he is not entitled to the standard deduction but must itemize his "below-the-line" deductions. Sec. 63(e)(1)(A).

Kenmore began as a retail gasoline station about 1972. By June of 1980 Kenmore had expanded into an automobile repair shop, and a dump truck and construction business. In late 1980 or early 1981 Kenmore further expanded into the transporting and wholesaling of bulk fuel. On July 1, 1981, Kenmore began to operate a second retail gasoline station, at 1066 Sheridan Drive, Tonawanda, New York, hereinafter sometimes referred to as the Sheridan location. The gasoline station business that Kenmore operated at the Sheridan location will hereinafter sometimes be referred to as the Sheridan station. Gleave bought the Sheridan location from an unrelated party on June 30, 1981. The Sheridan location is within 5 miles of the Kenmore location.

Gleave was often at the Kenmore location around 6 a.m. each day. However, Gleave was usually away from this location during most of the day. Gleave often worked "out on the road"--for example, driving and fixing Kenmore's trucks. Also, at one point during the years in issue Gleave spent some time in Indiana helping a brother run a construction business.

Joe Heintz (hereinafter sometimes referred to as Heintz) ran Kenmore's daily operations. Although Heintz was not a bookkeeper, he did some bookkeeping for Kenmore. Shirley Bohn (hereinafter sometimes referred to as Bohn) assisted Heintz with Kenmore's bookkeeping and secretarial work from January 1981 to March 1983.

Kenmore used the "one-write" system of bookkeeping, a "pegboard" accounting system, in which each check that was written on Kenmore's Account was simultaneously recorded as a disbursement. If desired, notations could be made on the one-write record. (See the description in Safeguard Business Sys. v. New England Bus. Sys., 696 F. Supp. 1041, 1042 (E.D. Pa. 1988).) In addition to disbursements, deposits were recorded on Kenmore's one-write system. During the years in issue Bohn and Heintz made all (or substantially all) of the bookkeeping entries on Kenmore's one-write system.

Each disbursement listed in Kenmore's one-write system had a corresponding notation in one of several columns, which explained the purpose for which the disbursement was made. One of these columns, headed "Gleave account", was used as a catch-all for all the disbursements that Bohn and Heintz did not know how to classify. Neither Bohn nor Heintz was trained in accounting. Bohn understood that, when Schechter received the one-write ledgers each month from Kenmore, then he would determine the purpose of, and classify the items listed under the "Gleave account" heading. It is unclear what determinations and classifications Schechter actually made about the "Gleave account" items.[5]

---

[5] Testimony from Schechter might have been useful in clarifying the facts of this case. Despite Schechter's being available and living in the Buffalo area (where most of the trial
(continued...)

At times, Heintz, Bohn, Gleave, and Clifford Pixley (hereinafter sometimes referred to as Pixley) all signed Gleave's name as maker on Kenmore's checks.[6] Pixley is Gleave's half-brother. Pixley worked at the Kenmore location for Kenmore; he also drove trucks for Robert Broskin, hereinafter sometimes referred to as Broskin.

Kenmore's expansion into the wholesale fuel business occurred together with the expansion of Broskin's trucking business into the wholesale fuel business. Broskin and Gleave met in 1980 while both were working on a rapid-transit underground rail project in Buffalo. At that time both Kenmore and Broskin were operating dump trucks for this project. A few months after they met, Gleave suggested to Broskin that Broskin park his trucks at the Kenmore location, and Broskin did so. At or around this time Broskin began operating his business out of

---

[5](...continued)
was conducted), neither petitioners nor respondent chose to subpoena him. As we indicated at trial, we conclude that Schechter was not peculiarly within one side's power to produce, and that Schechter was equally available to both sides; accordingly, Schechter's absence from the trial does not give rise to any inference under Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); see United States v. Rollins, 862 F.2d 1282, 1297-1298 (7th Cir. 1988); Kean v. Commissioner, 469 F.2d 1183, 1187-1188 (9th Cir. 1972), affg. on this issue and revg. on another issue 51 T.C. 337, 343-344 (1968).

[6] Respondent presented an expert witness to testify about the signatures on Kenmore's checks. This witness's testimony was unpersuasive, and was not relied upon by the Court. See Estate of Jung v. Commissioner, 101 T.C. 412, 450-451 n.16 (1993).

Kenmore's office, and Broskin took over some of the responsibility of dispatching Kenmore's trucks. After the Sheridan station opened, Broskin parked his trucks at the Sheridan location because there was more space. Until Broskin moved his trucks to the Sheridan location, Broskin spent 1 to 2 hours each day at the Kenmore location. Thereafter, Broskin mostly worked out of the Sheridan location and did not appear very often at the Kenmore location.

During the years in issue although Broskin had his own checking account at Marine Midland Bank, Broskin sometimes used Kenmore's Account when he needed Kenmore's lines of credit. When Heintz or Bohn recognized that Broskin used Kenmore's Account, these transactions were recorded under the "Gleave account" heading on the one-write system. Broskin used Kenmore's lines of credit to buy fuel in order to resell it at wholesale. Kenmore had lines of credit at two on more refineries. Broskin charged the purchase price of fuel at the refineries to Kenmore's Account. Kenmore paid the refineries for this fuel, and Broskin paid Kenmore. Also, Kenmore provided currency and bank drafts to Broskin in order for Broskin to buy tanker-loads of fuel. Broskin repaid Kenmore for this currency and these bank drafts, ordinarily within a few days.

There was usually a significant amount of money ($2,000-$20,000) in the safe at the Kenmore location. Bohn, Heintz, Broskin, Gleave, and Pixley all handled this money; each of them

placed money in and took money out of this safe.  Money belonging to either Kenmore or Broskin was put in the safe at the Kenmore location.  Although Kenmore had some records of cash receipts and expenditures for both the Kenmore station and the Sheridan station, at least for 1982, there was not a system to keep track of whose money was in the safe at the Kenmore location.  Kenmore's currency transactions were not recorded on the one-write system, and Kenmore did not deposit all of its cash receipts into Kenmore's Account.  Overall, about 10 percent of the deposits into Kenmore's Account in Kenmore's fiscal 1981 and fiscal 1982 consisted of currency, with the rest consisting of checks.  The ratio for any one deposit was likely to vary substantially from the ratio for any other deposit.

At some point, Broskin began to participate in fuel "prebuys" every 2 weeks or so.  Most of Broskin's prebuys were with A1 Fuels, which was owned by Broskin's uncle.  A prebuy is an up-front payment to a refinery for a relatively large amount of fuel at a set price that is lower than the market price for single tanker-loads at the time of payment, with the fuel to be picked up at the refinery over a period of time.  When Kenmore participated in a Broskin prebuy, Kenmore provided currency, not checks, to Broskin.  The currency came from Kenmore's safe, or from Broskin's repayment of some other debt to Kenmore, or a combination thereof.

At some point, at Bohn's and Heintz's initiative, Kenmore began to charge a fee to Broskin for the paperwork involved in Kenmore's dealings with Broskin. In general, this fee amounted to 1 percent of the amount involved in the transaction. When Broskin used Kenmore's credit to buy gasoline, Broskin was required to pay the total amount promptly to Kenmore, while Kenmore retained the 1-percent discount for prompt payment of the supplier's gasoline bill.

Records & Tax Returns

At the time of trial some of Kenmore's records were missing. At some point the Department of Justice subpoenaed some of Kenmore's records. A year or more later, the Department of Justice returned the subpoenaed records. Thereafter, on June 29, 1986, many of Kenmore's records, along with other records, were stolen from the office of David Knoll (hereinafter sometimes referred to as Knoll). Some of these records were recovered after the theft, and some were never recovered.

On its tax returns for the indicated fiscal years, Kenmore reported gross receipts, purchases, taxable income, and total tax liability in the amounts shown in table 1.

Table 1

| Item | 1980 | 1981 | 1982 |
|------|------|------|------|
| Gross receipts | $484,527 | $391,070 | $1,710,217 |
| Purchases | 438,296 | 226,009 | 1,523,673 |
| Taxable income | 17,548 | 1,755 | 23,821 |

Total tax liability   2,972          -0-               -0-

On its tax return for its fiscal 1981, Kenmore showed (1) a tentative investment credit in the amount of $8,449, (2) an income tax liability before investment credit in the amount of $298, and (3) application of the investment credit to eliminate the income tax liability.  In the notice of deficiency, respondent allowed $8,151 investment credit and $617 new jobs credit for Kenmore's fiscal 1981.

On February 16, 1982, Kenmore filed an application for tentative refund of the $2,972 fiscal 1980 tax liability.[7] Respondent refunded this amount to Kenmore.  The fiscal 1980 deficiency that respondent determined results entirely from this refund.

On each of its tax returns for its fiscal 1980, 1981, and 1982, Kenmore reported that it did not pay any compensation to Gleave.

---

[7]     In the answer in the Kenmore docket, respondent states that the fiscal 1980 refund claim was based on a claimed fiscal 1981 net operating loss.  In the reply, Kenmore agrees.  On brief, however, respondent states that the claimed carryback was of an investment credit.  Neither side explains how Kenmore could have had a net operating loss from its fiscal 1981, when it reported taxable income of $1,755 on its fiscal 1981 tax return. Nor does either side explain the mechanics of either a net operating loss carryback or an investment credit carryback from Kenmore's fiscal 1981 to Kenmore's fiscal 1980.  See secs. 172(b)(2) (opening flush language); 46(b)(1).

Kenmore reported on Schedule L of each of its tax returns for its fiscal 1980, 1981, and 1982 a balance on line 18, loans from stockholders, as shown in table 2.

Table 2

| Item | 1980 | 1981 | 1982 |
|---|---|---|---|
| Beginning of year | $14,632 | $4,481 | $113,250 |
| End of year | 4,481 | 113,250 | 99,771 |
| Net increase or (decrease) | (10,151) | 108,769 | (13,479) |

Respondent received Kenmore's tax returns on the following dates: Kenmore's fiscal 1980 tax return on June 1, 1981; Kenmore's fiscal 1981 tax return on February 4, 1982; and Kenmore's fiscal 1982 tax return at some time after March 4, 1983.

The notice of deficiency in Kenmore's docket, dated April 13, 1984, was mailed on or about that date, less than 3 years after Kenmore filed its tax returns for all the years in issue.

Income

In the notice of deficiency respondent determined Kenmore's taxable income for its fiscal 1981 and its fiscal 1982 by using the bank deposits method and an analysis of checks disbursed, based on at least three sources of information, as follows: (1) Kenmore's one-write system, (2) Kenmore's bank deposit tickets and canceled checks, and (3) a box of receipts for cash payments, which box Kenmore gave to respondent. Tables 3 (fiscal 1981) and 4 (fiscal 1982) show, as to the components of respondent's

calculations, (1) what respondent determined in the notice of deficiency, (2) what respondent contends on brief, and (3) what the Court has redetermined.

Table 3

Fiscal 1981

| Item | Respondent-- Def. Notice | Respondent-- Brief | Court's Findings[1] |
|---|---|---|---|
| Increase in gross receipts | $1,072,790.42 | $991,918.10 | $985,318.11 |
| Less: Increase in purchase | 324,117.74 | 464,816.45 | 474,398.83 |
| Net | 748,672.68 | 527,101.65 | 510,919.28 |
| Legal fees disallowed[2] | 750.00 | 750.00 | 750.00 |
| Taxable income omitted | 749,422.68 | 527,851.65 | 511,669.28 |

[1]  These findings (and those in tables 4, 5, and 7, infra) are amounts that respondent has shown by clear and convincing evidence.  As indicated infra in part II.A., for purposes of determining the amounts of deficiencies without regard to fraud, $6,600 is to be added to the amounts shown in tables 3 and 4 as taxable income omitted.

[2]  These disallowed legal fees consist of a check in the amount of $250 (#334), which petitioners concede was for a personal obligation of Gleave, and a check in the amount of $500 (#414), which was used to pay legal fees associated with the Eggertsville Inn, a personal investment of Gleave, as discussed infra 1980-- Gleave Income--Clear and Convincing.

Table 4

Fiscal 1982

| Item | Respondent-- Def. Notice | Respondent-- Brief | Court's Findings[1] |
|---|---|---|---|
| Increase in | | | |

| | | | |
|---|---|---|---|
| gross receipts | $1,019,499.60 | $945,481.27 | $938,881.27 |
| Less: Increase in purchases | 553,080.81 | 557,014.91 | 589,531.60 |
| Net | 466,418.79 | 388,466.36 | 349,349.67 |
| Less: increased depreciation | 3,793.00 | 3,793.00 | 3,793.00 |
| Taxable income omitted | 462,625.79 | 384,673.36 | 345,556.67 |

[1] See supra table 3, note 1,

Table 5 shows the components and amounts of our calculations of Kenmore's increase in gross receipts.

Table 5

| Item | Fiscal 1981 | Fiscal 1982 |
|---|---|---|
| Total deposits to Kenmore's Account | $1,433,985.73 | $2,712,461.27 |
| Less: nontaxable deposits[1] | 65,187.62 | 58,844.00 |
| Total taxable deposits | 1,368,798.11 | 2,653,617.27 |
| Accounts receivable--end of year[2] | 11,574.00 | 7,055.00 |
| Less: accounts receivable--start of year[2] | 3,984.00 | 11,574.00 |
| Gross operating receipts | 1,376,388.11 | 2,589,098.27 |
| Less: gross receipts reported | 391,070.00 | 1,710,217.00 |

Increase in gross

| | | |
|---|---|---|
| receipts | 985,318.11 | 938,881.27 |

[1] For fiscal 1981, this includes $23,540.62 in proceeds from the sale of Gleave's mother's house, deposited into Kenmore's Account on Sep. 10, 1980, in the form of a check in the amount of $17,215.58 and another check in the amount of $6,325.04. For each year, this includes $6,600 of purchase-money mortgage receipts that may have been deposited into Kenmore's Account.

[2] The accounts receivable amounts are as reported on Kenmore's tax returns.

Table 6 shows the components and amounts of the calculations of Kenmore's increase in purchases.

Table 6

| Item | 1981 | 1982 |
|---|---|---|
| Kenmore's total purchases | $700,407.83 | $2,113,204.60 |
| Purchase reported | 226,009.00 | 1,523,673.00 |
| Increase in purchases | 474,398.83 | 589,531.60 |

Table 7 shows Kenmore's total taxable income, the amount Kenmore reported, and the amount Kenmore omitted to report. See supra table 3 note 1.

Table 7

| Year | 1981 | 1982 |
|---|---|---|
| Total taxable income | $513,424.28 | $369,377.67 |
| Reported taxable income | 1,755.00 | 23,821.00 |
| Taxable income omitted | 511,669.28 | 345,556.67 |

Gleave

1980--Gleave Income--Clear and Convincing

During 1980 Kenmore issued 10 checks aggregating $2,853.35 to make Gleave's mortgage payments on his house. During 1980

Kenmore issued four checks aggregating $112.19 to make Gleave's payments on his life and disability insurance policies. On November 1, 1980, Kenmore issued a check in the amount of $250 to make Gleave's payment to an Indiana attorney in connection with his divorce proceedings. See supra table 3, note 2. On June 10, 1980, Kenmore issued a check to Eastern Airlines in the amount of $708 to pay for Gleave's flight to Florida to settle a relative's estate.

On December 15, 1980, Kenmore (1) paid $17,500 to Amherst Delta, Inc., for Gleave to buy for himself an interest in Eggertsville Inn, Inc., a tavern, and (2) paid $500 to LoTempio & Brown, a law firm, in connection with this purchase. See supra table 3, note 2. Kenmore did not own an interest in Eggertsville Inn, Inc. Kenmore deducted on its fiscal 1981 tax return the $500 LoTempio & Brown payment. This $500 payment was not an expense of any trade or business of Kenmore, but was an expenditure for the benefit of Gleave, in connection with Gleave's buying the Eggertsville Inn.

On February 28, 1980, Kenmore issued a check to "cash" in the amount of $400. Gleave received the $400 and used it to pay his personal expenses.

1980--Not Income to Gleave

On September 10, 1980, Gleave deposited $23,540.62 into Kenmore's Account. This money was from the sale of Gleave's mother's house. See supra table 5, note 1. On the same day Kenmore issued a check in the amount of $10,000, and on the next day a check in the amount of $11,403.57; both of these Kenmore checks were for Gleave's personal purposes, but Gleave's deposit into Kenmore's Account and Kenmore's checks were merely an accommodation by Kenmore.

On December 8, 1980, Gleave borrowed $15,000 from a bank and deposited it into Kenmore's Account. The same day, Kenmore issued a check to "cash" in the amount of $20,000. Gleave's deposit into Kenmore's Account and Kenmore's check (to the extent of $15,000) were merely an accommodation by Kenmore.

A November 7, 1980, Kenmore check in the amount of $1,135 to Broskin is not a payment to, or for the benefit of, Gleave.

Kenmore's checks to "cash" in the amounts of $1,978.50 (Nov. 11, 1980), $5,044.12 (Nov. 17, 1980), and $1,233.25 (Dec. 16, 1980) were cashed by Heintz, who gave the money to Gleave, who used the money to pay for fuel and repairs for Kenmore vehicles.

1980--Other Items--Burden of Proof

Kenmore's April 29, 1980, check to Western-Southern Insurance Co. in the amount of $2,070.50 was for "key-man" life insurance on Gleave's life.

In addition to the items discussed supra, during 1980 Kenmore issued checks, or otherwise made payments, aggregating

$28,559 to "cash" or named payees.  The evidence of record as to the key-man life insurance and these items does not enable us to conclude that any of these Kenmore payments was--or was not-- income to Gleave.  We refer to the latter category of items as resolved by "burden of proof."

Table 8 summarizes respondent's determinations as to Gleave's 1980 income subject to tax, and our redeterminations.

Table 8

|  | Respondent's Determinations | Court's Redeterminations |
|---|---|---|
| Income to Gleave | $98,747.58 | $22,323.54 |
| Not income to Gleave | --- | [1]45,794.44 |
| Burden of proof | --- | 30,629.50 |
| Totals | [2]98,747.58 | [2]98,747.48 |

[1]  $36,403.57 of this amount results from respondent's concessions in stipulations, and $1,135 results from respondent's oral concession at trial.  The remaining $8,255.87 results from the Court's evaluation of the evidence.

[2]  The parties' stipulations show that five of the checks listed in the notice of deficiency as $298.55 each should be $298.53 each.

1981--Gleave Income--Clear and Convincing

During 1981 Kenmore issued eight checks aggregating $2,388.26 to make Gleave's mortgage payments on his house. During 1981 Kenmore issued eight checks aggregating $231.84 to make Gleave's payments on his life and disability insurance policies.

On March 3, 1981, Kenmore paid $3,000 to Eggertsville Inn, which Gleave owned. This payment was not for any benefit to or purpose of Kenmore, but rather was for Gleave's benefit.

On June 12, 1981, Gleave bought a new 18-foot boat from Zahno Marine, Inc.; this boat is hereinafter sometimes referred to as the Zahno boat. Gleave paid $8,099.70 for the Zahno boat, after a trade-in credit of $1,500. This transaction was not reflected in Kenmore's Account, but Kenmore provided the money for Gleave to buy the Zahno boat. On July 31, 1981, Gleave registered the Zahno boat with the New York State Department of Motor Vehicles. On July 26, 1982, David T. Young, Gleave's cousin, registered the Zahno boat with this same agency. See infra Bankruptcies. At some later date, Gleave traded the Zahno boat in for a second boat. At the time of the trial herein, Gleave still had the second boat, although it was by then registered in the name of a relative.

1981--Not Income to Gleave

Checks numbered 585 ($3,000--Apr. 21, 1981), 643 ($3,500-- May 22, 1981), and 1039 ($8,549.92--Oct. 26, 1981) are not income to Gleave.

On August 21, 1981, Kenmore issued a check to "cash" in the amount of $181.72. The check, or the proceeds, was given to Gleave in order to reimburse him for his expenditures for gasoline and tolls while driving one of Kenmore's trucks.

On September 17, 1981, Kenmore issued a check to Kenmore Mercy Hospital in the amount of $23. This was in payment of a charge for the hospital's emergency room treatment of a Kenmore employee.

In October 1981, on two occasions, Kenmore issued checks to M & T Bank to wire funds to repair Kenmore's trucks that had broken down a long distance from Buffalo. The checks were in the amounts of $1,553.39 and $1,448.25.

1981--Other Items--Burden of Proof

Kenmore's April 17, 1981, check to Western-Southern Life Insurance Co. in the amount of $2,095.76 was for key-man life insurance on Gleave's life.

In addition to the items discussed supra, during 1981 Kenmore issued checks, or otherwise made payments, aggregating $376,926.37 to "cash" or named payees. The evidence of record as to the key-man life insurance and these items does not enable us to conclude that any of these Kenmore payments was--or was not-- income to Gleave.

Table 9 summarizes respondent's determinations as to Gleave's 1981 income subject to tax, and our redeterminations.

Table 9

|  | Respondent's Determinations | Court's Redeterminations |
|---|---|---|
| Income to Gleave | $411,038.63 | $13,719.80 |
| Not income to Gleave | --- | [1]18,256.28 |
| Burden of proof | --- | 379,022.13 |

Totals                     [2]411,038.63              [2]410,998.21

[1] $15,049.92 of this amount results from respondent's concessions in stipulations.  The remaining $3,206.36 results from the Court's evaluation of the evidence.

[2] In the notice of deficiency checks numbered 929 ($23) and 1024 ($17.42) are counted twice.

1982--Gleave Income--Clear and Convincing

On January 29, 1982, Kenmore issued a check to Gleave in the amount of $85,000.

During 1982 Kenmore issued two checks aggregating $432.20 to make Gleave's mortgage payments on his house.  During 1982 Kenmore issued 19 checks and made seven electronic fund transfers aggregating $1,201.02 to make Gleave's payments on his life and disability insurance policies.

In February 1982 Kenmore issued two checks to Grand Island, aggregating $1,478.58, in payment of real estate taxes on residential property.  Gleave was liable for these taxes.

During 1982 Kenmore issued seven checks to the Bank of New York, aggregating  $15,400, in payment of rental or mortgage obligations of Eggertsville Inn.  On July 12, 1982, Kenmore issued a check to Niagara Mohawk in the amount of $1,942.42 for electric power for the Eggertsville Inn.  On August 17, 1982, Kenmore issued a check to the Eggertsville Inn in the amount of $78.75.  Gleave owned the Eggertsville Inn.  These payments were for Gleave's benefit and were not for any benefit to or purpose of Kenmore.

On October 22, 1982, Kenmore issued a check to US Air in the amount of $298 for an airline ticket to enable Gleave to visit his mother, in Florida.  On December 21, 1982, Kenmore issued checks to the City of St. Petersburg, Florida Power and Light, and Central Telephone (Fla.), in the respective amounts of $16.62, $21.43, and $169.73, in connection with Gleave's grandmother's house.

1982--Not Income to Gleave

On September 10, 1982, Kenmore issued a check to "cash" in the amount of $303.75.  This check, or the proceeds, was given to Gleave in order to reimburse him for his expenditures for gasoline and tolls while driving one of Kenmore's trucks.

1982--Other Items--Burden of Proof

Kenmore's December 31, 1982, check to Western-Southern Life Insurance Co. in the amount of $239.40 was for key-man life insurance on Gleave's life.

During 1982 Kenmore issued four checks to Blue Cross, aggregating $1,301.79 to pay for health insurance for Gleave and his family.

In addition to the items discussed supra, during 1982 Kenmore issued checks, or otherwise made payments, aggregating $7,424.25 to "cash" or named payees.  The evidence of record as to the key-man life insurance, the Blue Cross, and these items does not enable us to conclude that any of these Kenmore payments was--or was not--income to Gleave.

Table 10 summarizes respondent's determinations as to Gleave's 1982 income subject to tax, and our redeterminations.

Table 10

|  | Respondent's Determination | Court's Redeterminations |
|---|---|---|
| Income to Gleave | [1]$117,525.36 | $106,038.75 |
| Not income to Gleave | --- | 303.75 |
| Burden of proof | --- | 8,965.44 |
|  | [1,2]117,525.36 | [2]115,307.94 |

[1]  Form 5278 of the notice of deficiency shows this amount as $117,525.31.  However, the addition on that form and on Form 886-A is consistent with $117,525.36.

[2]  In the notice of deficiency checks numbered 1494 ($2,200) and 1555 ($17.42) are counted twice.

Deductions

In 1980, 1981, and 1982 Gleave paid mortgage interest in the amounts of $1,645.04, $1,586.85, and $750, respectively.  In 1982 Gleave paid real property taxes in the amount of $1,478.98 on property that Gleave owned.[8]

---

[8]    Respondent agrees that Gleave is entitled to deduct
(continued...)

## Bankruptcies

Gleave and Kenmore filed petitions for chapter 11 reorganization in the United States Bankruptcy Court for the Western District of New York on August 2 and 3, 1982, respectively.[9]

In their respective bankruptcy petitions, Gleave reported that he owned Eggertsville Inn, the stock of which had a "Market value" of $20,000, and Kenmore reported that it did not own stock of any corporation. Gleave reported that he received "Annual Income" of $16,872 from mortgages on two Tonawanda, New York, properties in each of the 2 years immediately before he filed his bankruptcy petition; Kenmore's bankruptcy petition shows it as the holder of the mortgages on these two properties. One of

---

[8](...continued)
sales tax in accordance with the appropriate sales tax table. Petitioners have not contended that Gleave is entitled to deduct any greater amount, e.g., on account of the 1981 Zahno boat purchase.

As a result of the foregoing (including supra note 4), Gleave's itemized deductions exceed the zero bracket amount (sec. 1(d)) for each of the years in issue.

[9]     The parties stipulated that Kenmore filed its ch. 11 petition on Aug. 2, 1982. Our finding is in accord (1) with the stipulated copy of the ch. 11 petition, which shows on its face the Bankruptcy Court's stamp that the ch. 11 petition was filed on Aug. 3, 1982, and (2) with Knoll's testimony that the ch. 11 petitions were filed with the Bankruptcy Court on consecutive days.

Gleave was discharged from bankruptcy on Sept. 22, 1986, and Kenmore was relieved of the automatic stay provisions of 11 U.S.C. sec. 362 (1994) on or about May 16, 1989, for the purpose of filing a petition and proceeding in the Tax court.

these mortgages is on the property where Ted's Nursery had been, across the street from the Kenmore location. Gleave's bankruptcy petition indicates that he was paid $550 per month ($6,600 per year) on this mortgage. Kenmore's bankruptcy petition indicates that this mortgage was worth about $65,000. The other of these mortgages is identified by street address in both bankruptcy petitions; this address is not the address of either the Kenmore location or the Sheridan location.

On Kenmore's bankruptcy petition, Kenmore reported that it did not make any payments on loans during the year before August 3, 1982, and Kenmore did not include Gleave in the list of its creditors. Gleave did not include on his bankruptcy petition's list of assets any debt from Kenmore to him, and he reported that he did not have any interest in a boat. See supra 1981--Gleave Income--Clear and Convincing. On their respective bankruptcy petitions, both Gleave and Kenmore reported that Kenmore had paid $10,000 compensation to Gleave during the past year.

On July 28, 1982, Gleave certified "under penalty of perjury" that the statements in his and Kenmore's bankruptcy petitions "are true and correct to the best of * * *[his] knowledge, information, and belief."

### Criminal Activity

On December 8, 1982, Gleave, Kenmore, and Joseph A. Matthews were indicted by a Federal grand jury on 27 counts for stealing

gasoline from the Tonawanda, New York, refinery and tank and storage facility of Ashland Oil, Inc.

On April 14, 1983, Gleave pleaded guilty in United States District Court for the Western District of New York to two of these counts: (1) Wire fraud, and (2) embezzlement and theft. Also, on this date Kenmore (through Gleave) pleaded guilty to embezzlement and theft. The theft of gasoline occurred on various occasions between July 1981 and January 1982. Gleave stole the gasoline on at least 7 different days, loading Kenmore's tanker-trucks with the stolen gasoline, three to four times on each of the days. Gleave then drove the trucks to the Kenmore location (or perhaps the Sheridan location), unloaded the gasoline, and then sold the gasoline at retail in the normal course of Kenmore's business. Gleave or Kenmore made a profit of about $120,000 on this stolen gasoline.

The other counts of the indictments were dismissed. Gleave was sentenced for the crimes to which he pleaded guilty, to 5 years' imprisonment and to pay fines totaling $6,000. The record does not indicate what sentence was imposed on Kenmore.

On February 22, 1990, Gleave was indicted by a Federal grand jury on numerous counts including bankruptcy fraud.

On March 2, 1992, Gleave was found guilty in the United States District Court for the Western District of New York of bankruptcy fraud, in that Gleave knowingly and fraudulently concealed from the Trustee and other officers of the Court, and

from creditors, money deposited in a bank account outside the United States.  Gleave was sentenced to Federal custody for 27 months (2 years' probation and 3 months to be served in a half-way house) and a fine of $5,000.  Also, on this date Gleave was found guilty of another count of bankruptcy fraud; however, the conviction on this other count was reversed by the United States Court of Appeals for the Second Circuit.

_____

Kenmore's various business activities are collectively the source of its unreported income.

Respondent has shown by clear and convincing evidence that none of Kenmore's suggested nontaxable sources (other than the $6,600 per year purchase-money mortgage payments) explains Kenmore's unreported income.

The amounts shown supra in tables 8, 9, and 10 as "Income to Gleave" and "Burden of Proof" in the columns headed "Court's Redeterminations" were not Kenmore's repayments of loans from Gleave.

For each of its fiscal 1980, 1981, and 1982 years, Kenmore had an underpayment of income tax required to be shown on its tax return; some part of the underpayment for each of these years was due to Kenmore's fraud.

For each of the years 1980, 1981, and 1982, Gleave had an underpayment of income tax required to be shown on his tax

return; some part of the underpayment for each of these years was due to Gleave's fraud.

## OPINION

Respondent contends that (1) petitioners underpaid their taxes for 1980 through 1982, and (2) petitioners' 1980 through 1982 underpayments are due to fraud and thus petitioners are liable for the fraud additions to tax under section 6653(b). Respondent also maintains that Kenmore is not permitted to deduct any payments by Kenmore to or for the benefit of Gleave.

Petitioners contend that (1) they did not underpay their taxes for 1980 through 1982, and (2) respondent has not met respondent's burden of proof on the fraud issue.  Petitioners maintain that (A) most of the checks drawn against Kenmore's Account, payable to cash are not income to Gleave, because they were used to buy tanker loads of fuel, (B) the checks drawn against Kenmore's Account, used to pay for investments and personal expenses of Gleave are not income to Gleave because they were Kenmore's repayment of a loan owed to Gleave, (C) checks drawn against Kenmore's Account to pay for investments made in Gleave's name were not income to Gleave, because the investments were not Gleave's but were Kenmore's, and (D) much of the money deposited into Kenmore's Account belonged to others.

We agree in general with respondent.[10]

---

[10]    In the notice of deficiency to Gleave, respondent determined that Gleave had income in the amounts that Kenmore
                                                          (continued...)

## I. Fraud

When respondent seeks to impose the addition to tax under section 6653(b),[11] respondent has the burden of proof. To carry

---

[10](...continued)
paid to Gleave or for Gleave's benefit.  Respondent also determined that Gleave is liable for self-employment taxes for each of the years in issue.  On brief, respondent refers to this income as being entirely dividend income.  Petitioners' contentions do not include any challenge to respondent's implicit self-employment income determinations in the notice of deficiency, nor to issues such as Kenmore's earnings and profits that would be relevant to a dividend characterization.  See, e.g., Hagaman v Commissioner, 958 F.2d 684, 692, 695 (6th Cir. 1992), affg. and remanding T.C. Memo. 1987-549; DiLeo v. Commissioner 96 T.C. 858, 888-889 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Also the parties do not discuss whether any portion of these amounts should be treated as employee compensation for Gleave's personal services, which could affect both Gleave's and Kenmore's tax liabilities.  In the circumstances of the instant cases, we limit ourselves on this matter to what is disputed by the parties.  E.g., George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. 686, 698 (1984); Estate of Fusz v. Commissioner, 46 T.C. 214, 215 n.2 (1966).

[11]     Sec. 6653(b) provides, in pertinent part, as follows:

SEC. 6653.  FAILURE TO PAY TAX.

* * * * * * *
(b) Fraud.--

(1) In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.

(2) Additional amount for portion attributable to fraud.--There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601--

(A) with respect to the portion of the underpayment described in paragraph (1) which is
(continued...)

this burden for a year, respondent must prove two elements, as follows: (1) That petitioner has an underpayment of tax for that year, and (2) that some part of that underpayment is due to fraud.  Sec. 7454(a);[12] Rule 142(b); e.g., <u>Carter v. Campbell</u>,

---

[11](...continued)
attributable to fraud, and

> (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).

For 1980 and 1981, the fraud addition to tax is provided for in sec. 6653(b), the first sentence of which is the same as the above-quoted sec. 6653(b)(1).

Par. (2) was added by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616, and was effective for taxes the payment of which (determined without regard to any extension) is due after Sept. 3, 1982.  In the instant case, par. (2) is applicable to the additions to tax determined against petitioners for 1982.

The later amendments of this provision by sec. 1503 of the Tax Reform Act of 1986 (TRA 86--Pub. L. 99-514, 100 Stat. 2085, 2742), by sec. 1015(b)(2)(B) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3569), and by sec. 7721(a) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89--Pub. L. 101-239, 103 Stat. 2106, 2395) do not affect the instant case.

As a result of OBRA 89, the revised fraud addition to tax now appears in secs 6663 and 6651(f).

[12]    SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES.

(a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue
(continued...)

264 F.2d 930, 936 (5th Cir. 1959); Stone v. Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105, 106 (1969). Each of these elements must be proven by clear and convincing evidence. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 663-664 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. In carrying this burden, respondent may not rely on petitioners' failure to meet their burden of proving error in respondent's determinations as to the deficiencies. E.g., Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982), and cases cited therein.

Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Drieborg v. Commissioner, 225 F.2d 216, 219-220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954; Estate of Stein v. Commissioner, 25

---

[12](...continued)
shall be upon the Secretary.

T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). A mere understatement of income does not establish fraud. However, a pattern of consistent under-reporting of income for a number of years is strong evidence of fraud. Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memos. 1970-144 and 1970-37; Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100; Otsuki v. Commissioner, 53 T.C. at 108.

The issue of fraud poses a factual question that is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d at 303; Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224.

In order to establish fraud as to a petitioner, respondent must show that petitioner intended to evade taxes, which he or it knew or believed were owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. E.g., Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Danenberg v. Commissioner, 73 T.C. 370, 393 (1979); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). This intent may be inferred from circumstantial evidence, Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), including the

implausibility of petitioner's explanations, <u>Bradford v.</u>
<u>Commissioner</u>, 796 F.2d 303, 307 (9th Cir. 1986) (and cases
therein cited), affg. T.C. Memo. 1984-601; <u>Boyett v.</u>
<u>Commissioner</u>, 204 F.2d 205, 208 (5th Cir. 1953), affg. a
Memorandum Opinion of this Court dated Mar. 14, 1951.

### A. Kenmore

#### (1) Underpayments of Tax

Respondent's determination of a deficiency against Kenmore
for its fiscal 1980 is based entirely on disallowance of a
carryback from its fiscal 1981. <u>Supra</u> note 7. This disallowance
in turn is based entirely on respondent's determination that
Kenmore did not have any carryback from Kenmore's fiscal 1981.
We consider first Kenmore's tax liabilities for its fiscal 1981
and 1982, and then consider how our conclusions for these years
affect its fiscal 1980.

As shown <u>supra</u> in tables 3 and 4, respondent's
determinations as to Kenmore's income for its fiscal 1981 and
fiscal 1982 are almost entirely on account of adjustments that
(1) increase Kenmore's gross receipts, and (2) increase Kenmore's
purchase expenses, but by substantially lesser amounts.

#### (a) Gross Receipts

Respondent used the bank deposits method and an analysis of
checks disbursed to determine Kenmore's income for its fiscal
1981 and fiscal 1982. It is well established that bank deposits
are evidence of income where the deposits were made by the party

charged with the income or to an account controlled by the party charged with the income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The premise underlying the bank deposits method of income reconstruction is that, absent some explanation, a taxpayer's bank deposits represent income subject to tax. DiLeo v. Commissioner, 96 T.C. at 868. The use of the bank deposits method of income reconstruction has long been sanctioned by the courts. Id.; Tokarski v. Commissioner, 87 T.C. at 77; Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975) (and cases therein cited), affd. 566 F.2d 2 (6th Cir. 1977). When this method is used, respondent must take into account any nontaxable deposits or deductible expenses of which respondent has knowledge. DiLeo v. Commissioner, 96 T.C. at 868.

We have held that, where respondent has the burden of proof in a bank deposits case, e.g., where respondent has determined that a taxpayer has committed tax fraud, then--

> Respondent can satisfy * * * [the] burden of proving the first prong of the fraud test, i.e., an underpayment, when the allegations of fraud are intertwined with unreported and indirectly reconstructed income in one of two ways. Parks v. Commissioner, 94 T.C. at 661. Respondent may prove an underpayment by proving a likely source of the unreported income. Holland v. United States, 348 U.S. 121 (1954); Parks v. Commissioner, supra at 661; Nicholas v. Commissioner, 70 T.C. [1057,]* * * 1066 [(1978)]. Alternatively, where the taxpayer alleges a nontaxable source, respondent may satisfy * * * [the] burden by disproving the nontaxable source so alleged. United States v. Massei, 355 U.S. 595 (1958); Parks v. Commissioner, supra at 661. [DiLeo v. Commissioner, 96 T.C. at 873.]

The parties have stipulated that total deposits to Kenmore's Account amounted to $1,433,985.73 in Kenmore's fiscal 1981 and

$2,712,461.27 in Kenmore's fiscal 1982.  Supra table 5.  They also have stipulated that, of these amounts, at least $58,587.62 for fiscal 1981 and $52,244 for fiscal 1982 are nontaxable deposits.  The accounts receivable amounts used in calculating the increase in gross receipts, as shown supra in table 5, are taken from Kenmore's tax returns and are not disputed by either side.

We conclude, and we have found, that Kenmore's various business activities are collectively the source of its unreported income.  As discussed infra, we also conclude that none of the suggested nontaxable sources explains Kenmore's unreported income, except for Gleave's apparent deposits of $6,600 payments on a purchase-money mortgage from the sale of Ted's Nursery.

Kenmore contends that because Broskin used Kenmore's lines of credit and charged fuel at the refineries to Kenmore, Broskin's money was just passing through Kenmore's Account, and thus the amounts deposited into Kenmore's Account that came from Broskin should not be included in Kenmore's gross receipts, because these amounts are income of Broskin.

We have found that, when Broskin used Kenmore's lines of credit and charged fuel at the refineries to Kenmore, then Kenmore paid the refineries for this fuel, and Broskin paid Kenmore for this fuel.  So, although payments by Broskin deposited into Kenmore's Account are included in the total deposits to Kenmore's Account for its fiscal 1981 and its fiscal

1982, *supra* table 5, payments by Kenmore to the refineries for the fuel charged by Broskin are included in Kenmore's purchases for its fiscal 1981 and fiscal 1982.  *Supra* table 6.  As a result, amounts deposited into Kenmore's Account that came from Broskin are offset by payments from Kenmore's Account to the refineries for fuel charged by Broskin, and thus the amounts deposited into Kenmore's Account that came from Broskin are properly includable in Kenmore's gross receipts and do not explain Kenmore's unreported income.

This may be illustrated by a transaction to which Bohn testified.  Kenmore's one-write records show that on December 1, 1981, Kenmore wrote a check to American Refining Group, Inc., in the amount of $53,887.70.  Evidently, the original bill was in the amount of $54,432, and Kenmore took advantage of a one-percent discount ($544.30) for timely payment.  The one-write records show a December 1, 1981, $54,432 deposit to Kenmore's Account.  Evidently, Broskin paid $54,432 to Kenmore, which amount was deposited into Kenmore's Account.  Although the bank deposits method may arguably be said to overstate Kenmore's gross receipts by $54,432, this is offset by the Kenmore payment to American Refining Group, Inc., which (under that line of reasoning) overstates Kenmore's cost of purchases by $53,887.70.  Under the bank deposits method as applied in the instant cases, see *supra* tables 4 through 7, only $544.30 of taxable income results from the above-described transaction; that is the correct

result on these facts.  Thus, although petitioners may or may not be technically correct in contending that the bank deposits method overstates Kenmore's gross receipts because of these Broskin transactions, this method does not cause Kenmore's taxable income to be overstated.

Petitioners suggest that the prebuys may have resulted in the bank deposits method's overstating Kenmore's gross receipts. Only one prebuy is described in some detail, (1) in testimony by Bohn and Broskin and (2) in a stipulated extract from Kenmore's books and records.  On or about May 19, 1982, Kenmore gave $105,000 cash to Broskin, for him to buy 100,000 gallons of gasoline.  Broskin delivered the gasoline in 13 installments to Kenmore over a 5-week period.  Most of the deliveries were to the Sheridan location.  Broskin invoiced Kenmore for the delivered gasoline at $1.05 per gallon, plus an amount for trucking. Kenmore's books show the transaction as "Purchased in advance from Broskin", with each delivery resulting in a reduction of the amounts in both the "Bal. gal." and the "Bal. $" columns.  The final delivery, on June 22, 1982, resulted in the "Bal. gal." column being reduced to zero and the "Bal. $" column being reduced to negative $2,240.57.  This last amount is shown as having been paid on June 25, 1982, with the balance in the "Bal. $" column then shown as zero.  We are satisfied from the record in the instant cases that this transaction involved (1) $107,240.57 deductible expenditures ($105,000 for the gasoline

plus $2,240.57 for the trucking)[13], (2) gross receipts in the amount Kenmore received from selling the 100,000 gallons of fuel, and (3) no double inclusion of gross receipts for Kenmore. Thus, prebuys do not result in overstating Kenmore's gross receipts, nor in overstating Kenmore's taxable income.

Petitioners assert on brief that "More than $100,000. was placed in [Kenmore's account] by * * * Gleave at the time of the sale of the business and equipment of Ted's Nursery". Gleave sold Ted's Nursery about 1978. If Gleave deposited the proceeds of this sale to Kenmore's Account more or less contemporaneously with the sale, then this deposit did not increase Kenmore's gross receipts for fiscal 1981 or 1982. Also, Kenmore reported on its fiscal 1980 tax return that the loans from stockholders account showed an opening fiscal 1980 balance (i.e., a balance as of Sept. 1, 1979) of only $14,632 and a closing (as of Aug. 31, 1980) balance of only $4,481. Supra table 2. Thus, even if we were to credit petitioners' contentions, substantially all the proceeds of the Ted's Nursery sale had already worked through Kenmore's Account before any of the years in issue in the instant cases.

---

[13] We note a $49.50 arithmetic error on Kenmore's ledger sheet in computing the balance after the last delivery. The net to Broskin should have been $2,290.07, instead of $2,240.57. A careful examination of the ledger sheet suggests that it originally did show $2,290.07, but someone changed the 9 to 4 and changed the 0 to 5. We have not been given a reconciliation or other explanation. This $49.50 differential does not affect any of our conclusions.

Gleave took a purchase-money mortgage on his sale of Ted's Nursery; this is consistent with part of Gleave's bankruptcy petition. There also was testimony that Gleave put into Kenmore's Account the $550 monthly payments on the purchase-money mortgage. The record does not enable us to conclude by clear and convincing evidence that $6,600 per year of the deposits into Kenmore's Account did not come from payments on the purchase-money mortgage from the sale of Ted's Nursery.

Petitioners assert that "Approximately $70,000, was placed in [Kenmore's Account] reflecting the inheritance of * * * Gleave and his brother Terrance". It appears that, on September 2, 1980, the estate of Gleave's grandmother (Edith Service) distributed $30,900 to Gleave and the same amount to his brother, Terrance J. Gleave. At various points in the trial, Gleave testified to the effect that (1) he received his brother's check, as well as his own, because his brother owed money to him, (2) both Gleave's and his brother's checks were deposited into Kenmore's Account as a loan by Gleave to Kenmore, and (3) as of the time of the trial, Kenmore had not yet repaid this loan from Gleave.

However, we have carefully examined the evidence as to deposits into Kenmore's Account, and the only deposits involving checks at least as great as $30,900 in Kenmore's fiscal 1981 are checks of $34,575.24 and $35,719.96, on August 18 and 20, 1981, respectively, deposited about 11½ months after the apparent

estate distributions.  These facts are inconsistent with Gleave's testimony.  Also, Gleave, who is the sole source of the evidence that the 1980 inheritance was deposited as a loan into Kenmore's Account and not repaid by Kenmore, certified under penalty of perjury in the bankruptcy petitions in effect that Kenmore did not owe him any money in 1982.  Gleave's certification is inconsistent with Gleave's testimony.  We note that $23,540.62 of proceeds from the sale of Gleave's mother's house was deposited into Kenmore's Account on September 10, 1980, just 8 days after the apparent distributions from Gleave's grandmother's estate.  This deposit has been excluded from Kenmore's income as a nontaxable deposit (supra table 5, note 1), and Kenmore's checks to Gleave shortly thereafter have been excluded from Gleave's income.  It is conceivable that Gleave may have confused this transaction with the apparent inheritance.  We have already taken account of this transaction.

We conclude that the apparent inheritance is not a nontaxable source of gross receipts to Kenmore.

Petitioners assert that "Kenmore routinely cashed checks for many of its suppliers and other persons involved in related businesses, all of which checks went through its account, but were incorrectly attributed to * * * Kenmore as income."  We have found that Kenmore routinely kept thousands of dollars, sometimes tens of thousands of dollars in its safe.  The deposits into Kenmore's Account often included currency.  From this we conclude

that any check-cashing by Kenmore might have affected the mix of checks and currency that Kenmore deposited, but did not affect the total amounts of the deposits.  Accordingly, we conclude that, if Kenmore indeed did any check-cashing, that is not a nontaxable source of gross receipts.

We conclude, and we have found, that respondent has shown by clear and convincing evidence that none of Kenmore's suggested nontaxable sources (other than the $6,600 per year purchase-money mortgage payments) explains its unreported income.

(b) Purchases.

On its tax returns, Kenmore claimed to have spent almost $1.75 million on purchases over fiscal 1981 and fiscal 1982. Supra tables 1 and 6.  In the notice of deficiency, respondent determined that Kenmore had spent $877,000 more than Kenmore had claimed for those 2 years.  Supra tables 3 and 4.  On brief, respondent concedes that Kenmore spent over $1 million more than Kenmore had claimed for those 2 years.  Supra tables 3 and 4. Our findings are in amounts slightly greater than respondent's concessions.  Supra tables 3, 4, and 6.  Thus, we treat Kenmore as having spent, and as being entitled to subtract, more than $2.81 million in purchases for those 2 years, even though Kenmore claimed only $1.75 million on its tax returns for those 2 years. Supra tables 3, 4, and 6.

Petitioners do not make any specific contentions on brief about their allowable costs of purchases.  They do make

generalized statements about the use of currency to make purchases. Both Broskin and Bohn testified about Kenmore's use of cash, including the extensive "recycling" of cash to pay for purchases. We are satisfied from the record in the instant cases that any such purchases not reflected in our Findings of Fact would be matched by gross receipts that were not deposited into Kenmore's Account, and so were not included in our Findings of Fact as to Kenmore's gross receipts. Petitioners have not directed our attention to, and we have not found, any additional costs of purchases that would have reduced the net of Kenmore's gross receipts minus its purchases.

Respondent need not prove that Kenmore did not have the offsetting deductions that petitioners assert in conclusory terms. Once the Commissioner has presented clear and convincing evidence of unreported gross receipts, the taxpayer has the burden of coming forward with evidence as to offsetting deductions claimed by the taxpayer, even in criminal cases where the Government must prove a deficiency beyond a reasonable doubt. E.g., United States v. Campbell, 351 F.2d 336, 338-339 (2d Cir. 1965); Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956); see also Reiff v. Commissioner, 77 T.C. 1169, 1175 (1981).[14]

---

[14]    This rule is independent of the general rule applicable to civil cases in which the taxpayer has the burden of proving entitlement to deductions before they may be allowed. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

We are satisfied, and we have found, that Kenmore understated the net of its gross receipts over its purchases by $510,919.28 for 1981 and $349,349.67 for 1982. Supra tables 3 and 4. We so hold.

### (c) Legal Fee--Eggertsville Inn

Respondent's determination against Kenmore for its fiscal 1981 is based primarily on the bank deposits method. In addition, respondent disallowed Kenmore's deduction of a $500 payment by Kenmore to a law firm, LoTempio & Brown. This payment was made in connection with the Eggertsville Inn. Supra table 3, note 2. The notice of deficiency states that the payment is disallowed "because it has not been established that * * * [it was] for an ordinary and necessary business expense".

Section 162(a)[15] allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". In order to satisfy the requirements of section 162(a), an expense must be both ordinary and necessary, and it must have the requisite relationship to the taxpayer's business. George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. 686, 698 (1984). Also, "the trade or

---

[15] Sec. 162(a) provides, in pertinent part, as follows:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

business of the corporation must be considered separately from the trade or business of the shareholders." Markwardt v. Commissioner, 64 T.C. 989, 995 (1975).

Gleave testified that the December 1980 $17,500 Kenmore check to Amherst Delta, Inc., was "the deposit from 747 [Kenmore] to the landlord, if I recall, for Eggertsville Inn", which was "an investment of" Kenmore.  However, (1) Gleave's August 2, 1982, bankruptcy filing shows him (not Kenmore) as owner of Eggertsville Inn, Inc.; (2) Kenmore's August 3, 1982, bankruptcy filing shows Kenmore not owning any corporate stock and not otherwise owning any interest in Eggertsville Inn, Inc.; (3) Kenmore's fiscal 1981 tax return balance sheet shows that Kenmore did not own any corporate stock at all; and (4) Gleave told the IRS auditor that the $17,500 check was for a tavern that Gleave had an option to buy.  We conclude, and we have found contrary to Gleave's testimony, that Kenmore did not own an interest in Eggertsville Inn, Inc.  In addition, we conclude, and we have found, that the $500 LoTempio & Brown payment was in connection with Gleave's buying Eggertsville Inn, Inc.  This $500 was a capital expenditure, to be added to Gleave's basis in Eggertsville Inn, Inc., and was not currently deductible by Gleave or by Kenmore.

Petitioners do not contend that the $500 LoTempio & Brown payment was deductible by Kenmore for any alternative reason, e.g., as compensation to Gleave, and so we do not consider

alternatives.  See, e.g., <u>Estate of Fusz v. Commissioner</u> 46 T.C. 214, 215 n.2 (1966).

We hold for respondent on this issue.

<u>(d) 1980</u>

It is clear that our determinations eliminate any possible claim of Kenmore net operating loss carrybacks from its fiscal 1981 or fiscal 1982.  <u>Supra</u> tables 1, 3, and 4.  Respondent does not dispute Kenmore's claimed investment credits for fiscal 1981 or fiscal 1982; in fact respondent increases Kenmore's claimed fiscal 1982 investment credit by $1,896.50.  Neither of these allowed investment credits is great enough to generate an investment credit carryback to fiscal 1980.  Thus, Kenmore has a $2,972 deficiency for fiscal 1980, generated entirely by the elimination of the claimed carryback from fiscal 1981.  <u>Supra</u> note 7.  We have so found.

We hold for respondent on this issue.

<u>(e) Summary</u>

We conclude, and we have found, that respondent has proven by clear and convincing evidence that Kenmore had an underpayment of tax for each of the years in issue.

We hold for respondent on this issue.

## (2) Fraudulent Intent

Respondent contends as follows:  (1) Kenmore's failure to keep or furnish adequate books and records is a strong indicium of fraud; (2) Kenmore's failure to report substantial amounts of

gross receipts for both its fiscal 1981 and its fiscal 1982 "is an obvious indication" of its fraudulent intent to evade tax; (3) petitioners' explanations of Kenmore's asserted large nontaxable deposits and the reasons for large cash expenditures are so implausible that the giving of the explanations is itself a further indication of fraud; (4) "Kenmore's * * * pleas to theft and * * * admission to the receipt of income resulting from this theft is further proof of * * * fraudulent intent"; and (5) Kenmore's "extensive dealings in cash * * *[show its] attempt to conceal corporate assets".

Petitioners contend as follows: (1) Kenmore made a good faith effort to keep adequate records, and was prevented from producing all its records by a burglary of Kenmore's then-attorney's office, and by New York State's auctioning off of the remaining contents of that office; (2) Kenmore was "forced by market conditions to operate for many vital transactions on a cash basis"; and (3) Kenmore did not conceal its income and Gleave "was not educated, and he left the bookkeeping to trusted long term employees, each of whom did the best they [sic] could with the transactions at hand".

We agree with respondent's conclusion and with some of respondent's contentions.

In weighing Kenmore's intent and actions, we note that a corporation is a separate entity, created by statute, which acts through its officers, employees and agents.  Benes v.

Commissioner, 42 T.C. 358, 382-383 (1964), affd. 355 F.2d 929 (6th Cir. 1966); Ace Tool & Eng., Inc. v. Commissioner, 22 T.C. 833, 843 (1954).  Where there are a number of shareholders, all of whom are parties to the fraud, their fraudulent intent is attributed to the corporation.  Ace Tool & Eng., Inc. v. Commissioner, 22 T.C. at 843.  Similarly, the fraud of a sole or dominant shareholder can be attributed to the corporation.  Benes v. Commissioner, 42 T.C. at 383; Auerbach Shoe Co. v. Commissioner, 21 T.C. 191, 194 (1953), affd. 216 F.2d 693, 697-698 (1st Cir. 1954).  Corporate fraud exists if an agent commits fraud and the corporation is the agent's alter ego, or the agent is acting on behalf of the corporation such that the corporation actually benefits from the fraudulent acts.  Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 506 (10th Cir. 1973), affg. on this issue T.C. Memo. 1971-194; see Federbush v. Commissioner, 34 T.C. 740, 749-751 (1960), affd. 325 F.2d 1 (2d Cir. 1963).

We have found, pursuant to the parties' stipulation, that at all pertinent times Gleave was Kenmore's president and sole owner.

(a) Criminal Activity

Both Kenmore and Gleave pleaded guilty to embezzlement and theft of gasoline on various occasions between July 1981 and January 1982.  During the years in issue, Kenmore operated a retail gasoline station.  Kenmore's embezzlement and theft of

gasoline in its fiscal 1981 and its fiscal 1982 are significant evidence of its fraudulent intent with regard to its income taxes for these years. Bradford v. Commissioner, 796 F.2d at 308; Petzoldt v. Commissioner, 92 T.C. at 701-702; McGee v. Commissioner, 61 T.C. at 260.

### (b) Substantial Omissions

Kenmore reported taxable income in the amount of $1,755 for its fiscal 1981 and $23,821 for its fiscal 1982. Supra table 1. Kenmore failed to report taxable income in the amount of $511,669.28 for its fiscal 1981 and $345,556.67 for its fiscal 1982 (supra tables 3 and 4), which amounts to more than 99 percent of Kenmore's fiscal 1981 taxable income and more than 94 percent of its fiscal 1982 taxable income. Supra table 7. These omissions are not the result of any good-faith dispute as to taxability. See infra (d) Implausible Explanations.

The mere failure to report income is not sufficient to establish fraud. Petzoldt v. Commissioner, 92 T.C. at 700. However, exceedingly large discrepancies between the taxpayer's actual net income and the net income reported do constitute evidence of fraud when such discrepancies are not adequately explained. Stone v. Commissioner, 56 T.C. at 224. Kenmore's substantial omissions of taxable income for its fiscal 1981 and its fiscal 1982 are substantial evidence of fraud as to these 2 years.

### (c) Inadequate Records

An aggregate of more than $4.1 million was deposited into Kenmore's Account during Kenmore's fiscal 1981 and its fiscal 1982. Supra table 5. In addition to the $4.1 million of deposits into Kenmore's Account, there was some indeterminate amount of cash that passed through Kenmore's safe, and did not show up in Kenmore's Account. The one-write bookkeeping system focused only on Kenmore's Account. Both Gleave and Broskin used Kenmore's Account; the one-write system did not adequately distinguish among Kenmore, Gleave, and Broskin transactions. As Heintz and Bohn carried it out, the one-write system used a miscellaneous column (Gleave account) for any transactions that (1) they were aware of and (2) did not know how to classify. We cannot deduce what happened to many of the Gleave account items, except that we know that Heintz and Bohn put all the Broskin items that they recognized into the Gleave account. Not only was the currency in the safe (generally $2,000-$20,000) not recorded in the one-write system, but also there was not a system to enable Heintz or Bohn to know how much of the currency belonged to Broskin and how much belonged to Kenmore or Gleave.

Kenmore's operations were large enough and varied enough, and the comingling of Kenmore's, Broskin's, and Gleave's assets was extensive enough, so that it was obvious that detailed record-keeping was important. Failure to keep and supply adequate records may be an indication of fraud. Bahoric v. Commissioner, 363 F.2d 151, 154 (9th Cir. 1966), affg. T.C. Memo.

1963-333.  We understand that some portion of Kenmore's records had been stolen in 1986, and this was at least partially responsible for petitioners' inability to produce complete records at the trial.  However, the records that were produced, and the testimony of Bohn, Gleave, and Broskin, convince us that the records never were adequate to track through the maze of Kenmore's activities and assets.  Thus, the 1986 theft does not affect our conclusions on this point.

Kenmore's failure to make and keep adequate records, in the context of the instant cases, is significant evidence of fraud.

### (d) Implausible Explanations

Gleave's determination to run his financial activities through Kenmore--both with regard to Kenmore's Account and the cash in the safe at the Kenmore location--led to many of the record-keeping confusions that may have inspired several of the implausible explanations that petitioners offered in attempts to bridge the substantial gap between (1) the total deposits into Kenmore's Account and (2) the gross receipts reported on Kenmore's tax returns.

Thus, petitioners contend that more than $170,000 of the gap resulted from Gleave's deposits into Kenmore's Account--$100,000 from the Ted's Nursery sale and $70,000 from the apparent inheritance.  As we explained (supra, (a) Gross Receipts), we are satisfied that: (1) If any such deposit occurred after the Ted Nursery sale, then it did not affect more than $6,600 of the gap

for each of Kenmore's fiscal 1981 and fiscal 1982, and (2) Gleave did not deposit into Kenmore's Account the proceeds he claims to have received from his grandmother's estate.

Also, petitioners have tried to throw up smokescreens by general contentions that Broskin's dealings would fill this gap. But, as we have shown, Broskin's dealings would not have affected the substantial shortfall in Kenmore's reporting of its taxable income.

Petitioners have tried to explain away Kenmore's failure to keep sufficient records of currency by arguing that Kenmore's need for currency (e.g., in order to cash checks) explains the gap in its reporting. We have no reason to believe the underlying factual predicates. As far as we can tell, any check-cashing that Kenmore may have done probably was small in amount and affected only the check-versus-currency mix (and not the total amount) of the deposits to Kenmore's Account.

The transparent falseness of petitioners' explanation of Kenmore's reporting omissions is itself an indicator of Kenmore's fraudulent intent. Bahoric v. Commissioner, 363 F.2d at 153-154; Boyett v. Commissioner, 204 F.2d at 208.

We conclude from the foregoing, and we have found, that respondent has shown by clear and convincing evidence that Kenmore intended to evade its income taxes for each of its fiscal 1981 and fiscal 1982 years, which taxes Kenmore knew or believed

it owed, by conduct intended to conceal income, and prevent the collection of taxes.

    (e) 1980

    In general, if (1) a net operating loss is carried back from a fraud year to a nonfraud year, (2) a credit or refund is issued to the taxpayer, and (3) the credit or refund leads to an underpayment for the nonfraud year, then the underpayment for the nonfraud carryback year is treated as due to the fraud of the loss year.  Toussaint v. Commissioner, 743 F.2d 309 (5th Cir. 1984), affg. T.C. Memo. 1984-25.  Our holding that Toussaint is distinguishable and the rule is otherwise if the carryback is of a new jobs credit and the amount of the claimed credit is nonfraudulent, was reversed.  Arc Elec. Const. Co. v. Commissioner, 923 F.2d 1005 (2d Cir. 1991), revg. T.C. memo. 1990-30.  It appears that Kenmore's entire fiscal 1980 underpayment is attributable to a carryback from Kenmore's fiscal 1981, which may have been a carryback of a net operating loss or of an investment or new jobs credit.  Supra note 7.  The parties have stipulated that the instant cases are appealable to the Court of Appeals for the Second Circuit, which reversed us in Arc Elec.

    Our conclusion that Kenmore's fiscal 1981 underpayment is due to fraud leads us to conclude that Kenmore's fiscal 1980 underpayment also is due to fraud, whether the carryback was of a fiscal 1981 net operating loss (Toussaint) or an otherwise

allowable fiscal 1981 credit.  Arc Elec. Const. Co. v.
Commissioner supra; Golsen v. Commissioner, 54 T.C. 742 (1970),
affd. 445 F.2d 985 (10th Cir. 1971).  Accordingly, we do not in
the instant cases determine what is the nature of the claimed
carryback, nor do we at this time reconsider our holding in Arc
Elec.

We hold for respondent on this issue.

### B. Gleave

### (1) Underpayment of Tax

We have found that respondent has shown by clear and
convincing evidence that Gleave had income subject to tax in the
following amounts:  1980--$22,323.54; 1981--$13,719.80; 1982--
$106,038.75.  Supra tables 8, 9, and 10.  We have found that
Gleave is entitled to deductions that exceed the zero bracket
amount for each of these years.  Supra note 8 and associated
text.  It is evident, however that the deductions are not large
enough to eliminate Gleave's tax liability for any of these
years.  Gleave did not file tax returns for any of these years.
Accordingly, in the instant cases we conclude that Gleave's
entire tax liability for each year is a deficiency for that year
and an underpayment for that year.  Sec. 6653 (c).

We discuss several of the items that led to the conclusions
that Gleave has an underpayment of tax for each of the years in
issue.

### (a) Gleave Loans to Kenmore

The most significant dispute centers on petitioners' contention that Gleave made numerous loans to Kenmore, and that Kenmore's payments to Gleave, or on Gleave's behalf, were merely repayments of these loans and thus not income subject to tax for Gleave.

Gleave made a "soup sandwich" almost inevitable when he determined to use Kenmore's Account for his personal banking and not keep personal records. In our Findings of Fact, we have described two instances in which Gleave did deposit amounts into Kenmore's Account, and we concluded that certain payments to Gleave or for Gleave's benefit were not income to Gleave. Supra 1980--Not Income to Gleave. In the portion of our opinion dealing with Kenmore's gross receipts we examined and rejected petitioners' contentions as to the proceeds of the sale of Ted's Nursery (except for $6,600 per year) and the proceeds of Gleave's and his brother's apparent inheritances from their grandmother.

We observed Gleave as he testified. We examined the statements he signed under penalty of perjury in connection with his and Kenmore's bankruptcies, (1) as to his compensation from Kenmore, (2) as to Kenmore's not owing anything to him and not repaying any loans during the preceding year.

The $550 per month payments on the purchase-money mortgage from the sale of Ted's Nursery require a different analysis. In our analysis as to Kenmore, it was evident that, if the payments were deposited to Kenmore's Account, then Kenmore's taxable

income should be reduced because $6,600 of Kenmore's annual gross receipts came from a source that was nontaxable to Kenmore. We concluded that there was a sufficient likelihood that the deposits were made, so that respondent had failed to present clear and convincing evidence that the payments were not deposited into Kenmore's Account in the years in which the purchase-money mortgage payments were made. However, in order for us to conclude that Gleave's taxable income should be reduced, the mortgage payments had to be deposited into Kenmore's Account, and the deposits had to be by way of loans and not shareholder contributions to capital, and it had to be intended that some of the Kenmore payments to Gleave described in our Findings of Fact as Gleave Income--Clear and Convincing (and not those in Other Items--Burden of Proof) be repayments of the asserted loans. We conclude that the likelihood of all of those predicates being true is so slight that we are satisfied that respondent has negatived that likelihood by clear and convincing evidence.

We conclude, and we have found, that the income subject to tax as found is tables 8, 9, and 10 was not from Kenmore's repayment of Gleave loans.

(b) $85,000 Check

On January 29, 1982, Kenmore issued a check to Gleave in the amount of $85,000. At trial, Gleave testified as follows--

Q [Summer] Item C is a check payable to Ted Gleave. Do you recall what that was about?

A [Gleave] Yes, I do.

Q  Would you please tell the Court?

A  At this particular time I was about to be indicted by Ashland Oil. This money was in 747's account.  The monies really didn't belong to 747 or Ted Gleave and it had to be drawn out so it could pay the people that the monies really belonged to.

Q  Was part of that money used to repay loans by yourself to 747?  If you know.

A  I don't know.

Q  Do you recall a portion of that being utilized to pay for a truck?

A  That could have been some of the monies that were used to pay for our truck.

Q  Do you recall how much money you had to pay for that truck, approximately?

A  I'm going to just say in the $60,000 range.

Q  Do you know who actually went over and picked up the truck?

A  Yes, I do.

A  Who was that?

A  Bob Broskin.

Q  Do you know if he paid the money for the truck on your behalf?

A  I think Bob did.

Q  Then did 747 repay Mr. Broskin?

A  Yes.

On cross examination, Gleave testified as follows:

A [Warner] Paragraph 11(c) [of the stipulation] reflects that on January 29, 1982, you issued check 1246 payable to yourself in the amount of $85,000, correct?

A [Gleave] That's correct.

Q You testified relative to that $85,000 that you had written that check to pay off certain individuals who you owed money to.

A The gasoline people had turned around and had checks that were running through the systems, you might as well say.

Q Who were those individuals?

A Bob Broskin, Frank Calderella, James Tavenier.

Q Prior to January 29, 1982, 747 had written checks to Bob Broskin before that, hadn't they?

A Yes. I imagine they did, yes.

Q Subsequent to January 29, 1982, 747 wrote checks to Bob Broskin, didn't they?

A What do you mean?

Q After January 29, 1982, checks were written to Bob Broskin?

A I imagine they did. I don't have the records.

Q But in this instance you chose to write a check to yourself for $85,000 and pay off Bob Broskin in cash.

A No. I knew that the indictment was coming down for Ashland Oil. Everybody knew it. There was a grand jury investigation. What happened there was I was advised by my attorney and my bookkeeper that if you want to keep the stations in business and have the money to operate, take it out of the checkbook, because they are going to seize the checkbook.

Thus, Gleave testified that (1) the $85,000 did not belong to either him or Kenmore and had to be returned to the rightful owners, (2) most of the $85,000 was used to buy a truck for Kenmore (which Kenmore did not show as a depreciable asset on its fiscal 1982 tax return), and (3) the money had to be hidden from

Ashland Oil and kept available to Kenmore so that Kenmore could stay in business.

This $85,000 item is more than four times as large as the next largest item in the notice of deficiency to Gleave. Gleave testified as to the $85,000 item that he did "recall what that was about", even though the event was many years before the trial in the instant case. If Gleave did recall what that was about, then why did he promptly give us three conflicting stories under oath? If the $85,000 had to be returned to its rightful owners, then why did Kenmore not merely write checks to those owners, rather than pass the money into Gleave's hands? If Gleave spent about $60,000 to buy a truck for Kenmore, then why did Kenmore not show the truck (depreciation, investment credit) on its tax return? If Gleave kept it hidden on the side, then (1) what was to be gained, since Kenmore's creditors would quickly see the substantial check, and (2) what finally happened to the money?

After discounting Gleave's conflicting testimony, we are left with the fact that Kenmore paid the $85,000 to Gleave because of Gleave's decision that Kenmore should pay the money to him. Thus, the record herein establishes that (1) Gleave received the $85,000, and (2) the $85,000 came from Kenmore's Account, which is the source of many payments which constitute income to Gleave. See DiLeo v. Commissioner, 96 T.C. at 873; Tokarski v. Commissioner, 87 T.C. at 77. Gleave's testimony

convinces us that Gleave either kept the $85,000 or used it for his own purposes, and it is income to Gleave.

(c) Key-Man Insurance

During the years in issue Kenmore issued at least three checks to Western-Southern Life Insurance Co. as premium payments on an insurance policy on Gleave's life.  Gleave claims that these premium payments are not income to him, because this policy was a key-man life insurance policy.

Generally, life insurance premiums paid by an employer on the life of its employee, where the proceeds of the insurance are payable to the employee's beneficiary, are part of the employee's gross income.  Section 1.61-2(d)(2)(ii)(a), Income Tax Regs.  If the life insurance policy is an asset of the employer, then it may be that the premium payments made by the employer are not income to the employee, even if the employee is also the employer's controlling shareholder.  Resolution of this matter involves consideration of various factors.  See, e.g., Casale v. Commissioner, 247 F.2d 440 (2d Cir. 1957), revg. 26 T.C. 1020 (1956);[16] Centre v. Commissioner, 55 T.C. 16 (1970); Lacey v. Commissioner, 41 T.C. 329 (1963); Rev. Rul. 59-184, 1959-1 C.B. 65.

The record in the instant cases does not provide us with the information that is necessary to decide whether the life

---

[16]    The rationale of the Court of Appeals was accepted by this Court in Centre v. Commissioner, 55 T.C. 16, 20 (1970).

insurance premium payments made by Kenmore are, or are not, income to Gleave.  We thus conclude that the tax treatment of the checks in the amounts of $2,070.50 for 1980, $2,095.76 for 1981, and $239.40 for 1982 that Kenmore issued to Western-Southern Life Insurance Co. as premium payments is to be determined in accordance with the burden of proof.

(d) Blue Cross

During 1982 Kenmore issued at least four checks to Blue Cross.  Gleave claims that these checks were not income to him because they were payments for health insurance premiums for Gleave and his family.

Section 106[17] provides that "Gross income does not include contributions by the employer to accident or health plans for compensation (through insurance or otherwise) to his employees for personal injuries or sickness."  The regulations provide that the gross income of an employee also does not include contributions by the employer to health plans that include the employees's spouse and dependents.  Section 1.106-1, Income Tax Regs.  However, section 106 requires, by its terms, that the employer's contributions (here, Kenmore's payments of premiums to Blue Cross) be for compensation to the employer's employees.  See Larkin v. Commissioner, 48 T.C. 629, 632 n.3 (1967), affd. 394

---

[17]    Later amendments to this provision, providing exceptions for highly compensated individuals, did not apply until 1987, and so do not affect the instant cases.

F.2d 494 (1st Cir. 1968); Rev. Rul. 58-90, 1958-1 C.B. 88. Gleave was Kenmore's sole shareholder, its president, and an active worker. As we have pointed out (supra note 10), neither side in the instant cases is clear as to its position regarding which hat Gleave wore with regard to any of the Kenmore payments. Neither side has given us the benefits of stating, much less analyzing, its position as to whether section 106 properly leads to Gleave's excluding from his income Kenmore's payment of the Blue Cross premiums. Our analysis of the record in the instant cases does not enable us to redetermine this point. Thus, we conclude that the tax treatment of Kenmore's payments of the Blue Cross premiums is to be determined in accordance with the burden of proof.

### (e) Kenmore's Income

Petitioners contend "that the income attributed to Mr. Gleave was in fact income of 747 Kenmore." All of Gleave's income that we deal with in the instant cases are payments by Kenmore to or for the benefit of Gleave. There is not an inconsistency between an item of income to Kenmore providing the funds for a payment that results in income to Gleave.

### (f) Eggertsville Inn

Petitioners contend on brief that the Eggertsville Inn was "a wholly owned and operated subsidiary of 747 Kenmore." They state that "Ted Gleave and Shirley Bohn and Clifford Pixley all testified without contradiction that both 1066 Sheridan and the

Eggertsville Inn were wholly owned and operated subsidiaries of 747 Kenmore." Bohn's and Pixley's testimony to which petitioners cited does not appear to deal with the Eggertsville Inn. Only Gleave's testimony indicates that Kenmore was an owner of Eggertsville Inn. However, in contrast to the statements on brief, Gleave testified that Kenmore was one of three "partners", and not that Kenmore was sole owner of Eggertsville Inn. In even sharper contrast are the careful statements on both Gleave's and Kenmore's bankruptcy petitions that Gleave owned the Eggertsville Inn and that Kenmore did not own any interest in the Eggertsville Inn. Gleave executed both of these petitions and certified to their correctness under penalty of perjury. We believe Gleave's 1982 bankruptcy statements under penalty of perjury that he, not Kenmore, owned the Eggertsville Inn; we have so found.

(g) The Zahno Boat

Gleave testified that Kenmore provided the money to buy the Zahno boat. Gleave bought the Zahno boat in his own name and registered it in his own name with the New York State Department of Motor Vehicles. Gleave's cousin registered the Zahno boat 2 days before Gleave signed his and Kenmore's bankruptcy petitions, in which Gleave and Kenmore disclaimed any ownership of the Zahno boat and being a creditor of any debt related to it. When the smoke cleared, Gleave's cousin died, but apparently neither the cousin's widow, nor the cousin's estate or other heirs, had any

interest that survived, and Gleave traded the Zahno boat in for a second boat, which Gleave still had at the date of the trial. We are convinced that the cousin's involvement was not in derogation of Gleave's interest, and that Kenmore's providing Gleave with the money to buy the Zahno boat resulted in $8,099.70 income to Gleave for 1981.

### (h) Conclusion

We hold, and we have found, that respondent proved by clear and convincing evidence that Gleave had an underpayment of tax for each of the years 1981, 1982, and 1983.

### (2) Fraudulent Intent

Gleave knew he had income. He signed ("under Penalty of Perjury") Kenmore's bankruptcy petition on the very page where it states that Kenmore paid "$10,000 compensation", and he signed his own bankruptcy petition on the very page where it states that he took from his business "$10,000 - $200 per week draws self employed". Gleave knew that Kenmore was paying many of his obligations.

Gleave tried to "drop out" of the system. Gleave did not file tax returns, even though he signed Kenmore's tax returns. Gleave ran his funds through Kenmore's Account, thereby avoiding information reporting by any bank. Gleave did not have Kenmore provide information reports, such as Forms W-2 and 1099. Consistent with this approach, Gleave did not keep personal

records to show his income.  See, e.g., <u>Habersham-Bey v. Commissioner</u>, 78 T.C. at 313-314.

Gleave pleaded guilty to embezzlement and theft of gasoline from Ashland Oil, Inc., on various occasions between July 1981 and January 1982, activities which by their nature produce income.  <u>Bradford v. Commissioner</u>, 796 F.2d at 308; <u>Petzoldt v. Commissioner</u>, 92 T.C. at 701-702; <u>McGee v. Commissioner</u>, 61 T.C. at 260.

Gleave's overarching explanation is that Kenmore's payments to him, or for his benefit, are not income to him because they are merely repayments of loans by him to Kenmore.  We do not believe the stories of his receiving assertedly nontaxable sources of capital at convenient times.  In addition, we note that petitioners do not even contend that any of the asserted transfers by Gleave to Kenmore met any of the criteria for loans, as distinguished from contributions to capital.  For a discussion of such criteria and case law, see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 4.04, at 4-31 through 4-39 (6th ed. 1994).

Gleave's implausible explanations, which we reject, are themselves an indication of fraud.  <u>Bahoric v. Commissioner</u>, 363 F.2d at 153-154; <u>Boyett v. Commissioner</u>, 204 F.2d at 208.

We conclude from the foregoing, and we have found, that respondent has shown by clear and convincing evidence that Gleave intended to evade his income taxes for each of the years 1980,

1981, and 1982, which taxes Gleave knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.

We hold for respondent on this issue.[18]

C. Additional Amount for Portion Attributable to Fraud

The additional amount added to the tax under section 6653(b)(2) is equal to 50 percent of the interest payable under section 6601 and applies only to the portion of the underpayment that is attributable to fraud.  In the notices of deficiency respondent determined that this additional amount applies to the entire deficiencies determined against Kenmore for its fiscal 1982, and Gleave for 1982.  Respondent has the burden of proving by clear and convincing evidence what portion of the deficiency is attributable to fraud.  Sec. 7454(a); Rule 142(b).[19]

---

[18]    Because of our holding on this issue, we do not reach the alternative contention that Gleave is liable for additions to tax, under secs. 6651 (failure to timely file tax returns) and 6653(a)(negligence, etc.), which respondent asserted in the answer.

[19]    Sec. 1503(a) of TRA 86, 100 Stat. 2742, amended sec. 6653(b)(2) to provide as follows:

SEC. 6653.  ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD.

                  *    *    *    *    *    *    *
        (b) Fraud.--

                  *    *    *    *    *    *    *

        (2) Determination of portion attributable to
    fraud.--If the Secretary establishes that any portion
    of an underpayment is attributable to fraud, the entire
    underpayment shall be treated as attributable to fraud,
                                        (continued...)

(1) Kenmore

In part I.A. of this opinion, we considered the parties'
disputes as to the amounts of Kenmore's income in order to
determine whether respondent proved by clear and convincing
evidence that Kenmore has an underpayment of tax.  After
examining the evidence in the record, we concluded that
respondent carried this burden of proof for each of the years in
issue.  This conclusion applies also to our consideration of the
additional addition to tax under section 6653(b)(2) for Kenmore's
fiscal 1982.

In particular, we conclude that respondent has proven by
clear and convincing evidence that (consistent with our holding
supra in part I.A.) Kenmore omitted from taxable income
$345,556.67 for its fiscal 1982 (supra table 4), and that the
underpayment of tax resulting from this omission is attributable
to fraud.

We hold for respondent as to the amount of underpayment
resulting from this omission; we hold for petitioner as to any
other amount of underpayment for 1982.

---

[19](...continued)
        except with respect to any portion of the underpayment
        which the taxpayer establishes is not attributable to
        fraud.

This amendment placed the burden of proof on the taxpayer to
establish that a portion of the deficiency was not attributable
to fraud.  The amendment applies to tax returns the due date of
which is after Dec. 31, 1986, and so does not affect the instant
cases.

(2) Gleave

In part I.B. of this opinion we considered the parties' disputes as to the amounts of Gleave's income in order to determine whether respondent proved by clear and convincing that Gleave has an underpayment of tax. After examining the evidence in the record, we concluded that respondent carried this burden for each of the years in issue. This conclusion applies also to our consideration of the additional addition to tax under section 6653(b)(2) for 1982.

In particular, we conclude that respondent has proven by clear and convincing evidence that Gleave omitted from 1982 taxable income $106,038.75 (supra table 10), less the deductions described in our Findings of Fact (supra note 8 and associated text) and his personal exemption, and that the underpayment of tax resulting from this omission is attributable to fraud.

We hold for respondent as to the amount of underpayment resulting from this omission; we hold for petitioner as to any other amount of underpayment for 1982.

## II. Amounts of Deficiencies

In part I of this opinion respondent had the burden of proving, by clear and convincing evidence, that there were under-payments of tax, some part of which was due to fraud; respondent carried this burden. Also, in part I.C. of this opinion respondent had the burden of proving, by clear and convincing evidence, the amounts of petitioners' underpayments of tax for

1982 or fiscal 1982 that were attributable to fraud; respondent carried this burden to the extent described in part I.C.

In this part of the opinion, petitioners have the burden of proving by a preponderance of the evidence that respondent erred in the notice of deficiency determinations as to matters of fact. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

### A. Kenmore

We have set forth our findings as to the amounts of Kenmore's income for its fiscal 1981 and its fiscal 1982 <u>supra</u> in tables 3, 4, and 7. The amounts of Kenmore's omitted income for these years are derived from adjustments that (1) increase Kenmore's gross receipts, and (2) increase Kenmore's purchases.

We have held in part I.A. that respondent proved by clear and convincing evidence that for fiscal 1981 and fiscal 1982 Kenmore's taxable income was understated by the amounts set forth <u>supra</u> in tables 3 and 4.

In our analysis as to fraud, we indicated our uncertainty as to the matter of $6,600 per year of purchase-money mortgage payments. Petitioners have failed to carry their burden of proving that it is more likely than not that part of the deposits to Kenmore's Account consisted of these payments.

Accordingly we hold that, in computing Kenmore's deficiencies for its fiscal 1981 and 1982, the parties are to add $6,600 to the amounts set forth <u>supra</u> in tables 3 and 4 as

"Taxable income omitted" under the heading "Court's Findings".
We hold for respondent as to Kenmore's fiscal 1980.

## B. Gleave

We have set forth our findings as to the amounts of Gleave's income supra in tables 8, 9, and 10.

We conclude, and we have found, that Gleave has failed to carry his burden of proof as to the amounts set forth in the row "Burden of Proof" in tables 8, 9, and 10.

We hold for respondent in the amounts set forth supra in tables 8, 9, and 10, in the rows "Income to Gleave" and "Burden of Proof", less the amounts of deductions set forth in our Findings of Fact at note 8 and associated text; we hold for Gleave in the amounts set forth in tables 8, 9, and 10 in the row "Not Income to Gleave".

To take account of the parties' concessions and the foregoing,

Decisions will be entered
under Rule 155.[20]

---

[20]    At trial the parties were unsure whether Gleave was entitled to any dependency deductions for his children for the years in issue.  This matter is to be dealt with in the computations under Rule 155.